No. 2458.

## M. F. THOMPSON v. THE STATE.

1. HOMICIDE—ASSAULT AND BATTERY.—If a homicide be committed under the influence of sudden passion, by the use of means not in their nature calculated to produce death, and in the absence of an intention to kill, the circumstances not showing an evil or cruel disposition, the party killing would not be guilty of culpable homicide, but, self defense apart, would be guilty of some grade of assault and battery. See the opinion for a discussion of the articles of the Penal Code relating to manslaughter.

2. SAME—CHARGE OF THE COURT.—The proof in this case raising the questions whether or not the accused intended to kill the deceased, and whether or not the means used were in their nature calculated to produce death, the trial court should have given to the jury instructions appropriate to those issues.

3. SAME—SELF DEFENSE.—If the evidence on a trial for murder raises the issue of self defense, the accused is entitled to a charge upon that issue direct and affirmative in character. See the statement of the case for a charge upon self defense *held* insufficient because negative.

APPEAL from the Criminal District Court of Harris. Tried below before the Hon. James Masterson, on exchange.

Under an indictment which charged him with the murder of John B. Pickren, the accused was convicted of manslaughter, and was awarded a term of two years in the penitentiary.

Doctor W. O. Langdon was the first witness for the State. He testified, in substance, that he was called to see the deceased, under information that he had just been stabbed. Deceased died just as witness got to him. The knife entered the body just above the heart. It did not strike that organ. It was evident that the wound was inflicted by some person facing the deceased, and was struck in, and towards the right side and from above. Witness made no particular ante mortem and no post mortem examination at all.

Seaborn West was the next witness from the State. He testified that he witnessed the difficulty in which the deceased was killed. While defendant was sitting on a box in front of a store, in the Fifth ward of Houston, Texas, watching a crowd of boys playing at the games of "I Spy" and "Hide and Seek," the

deceased approached him and said something which the witness did not understand. Defendant got off the box and said: "Go away; I do not want anything to do with you; you called my mother a liar, and me a son of a b—h." As he jumped off the box the defendant ran his hand into his pocket. At this point the witness interfered, and said to defendant: "You had better go home; this is no place for a thing of that kind." Deceased, however, not satisfied, said to defendant: "I want to know how you make out that I called your mother a liar, and you a son of a b—h? I never spoke to your mother in my life. Who can you prove it by?" The defendant replied that he could prove it by his mother's negro cook. Deceased replied that he made no such imputations upon the character of either the defendant or his mother, and that he did not want the defendant about his ice house any more. Defendant replied that he could get in elsewhere; that he did not want deceased to fool with him any more, and that deceased's life was "getting shorter, any how." Deceased then threatened to slap the defendant, and defendant told him to slap. Deceased slapped defendant, and the two clinched, and pressed each other against the wall of the store. During the struggle which there ensued, the defendant called to the boys: "Don't let him hurt me!" The boys laughed. About that time the witness rushed in and pulled defendant off, and as the deceased stepped back he said: "You will hit me with brass knucks again, will you?" Deceased then fell, and defendant stooped over him, calling in a distressed voice: "John! Oh John!" About that time Cutter Rawley, deceased's partner, came up, and asked defendant: "M. F., did you cut him?" Defendant replied: "Yes, and by God, I would cut him again." At that particular time Doctor Langdon arrived. Witness did not hear what the deceased said to defendant when he first came up and spoke. He did not see the defendant strike the fatal blow, nor did he see the instrument with which he inflicted the fatal wound. Deceased was a heavier, if not a taller, man than defendant. Witness knew nothing of any previous difficulty between deceased and defendant. He had often seen them together, and they always appeared to be good friends.

Other witnesses for the State gave the same general account of the difficulty. None of them saw the instrument with which the fatal wound was inflicted. Some did, and some did not, hear deceased's remarks about being struck with brass knucks, but none of them saw any brass knucks. One or two of the wit-

nesses, testifying that defendant's mother appeared upon the scene just after the cutting, said that she exclaimed to defendant: "I told you not to leave home to-night; and I told you not to take that knife with you."

The witnesses for the defense gave the same general account of the fight, except that, according to them, the deceased, after defendant told him to go away, and that he did not want to have any thing to do with him since he applied the epithets to him and his mother, started off, and returned, before he threatened to and did slap the defendant, and that defendant had not yet left the box when deceased slapped him. None of the witnesses for the defense heard anything said about brass knucks, and, although all of them heard the defendant's mother remark that she had asked defendant not to visit the Fifth ward on that night, none of them heard her say anything about the knife. The said witnesses for the defense concurred in the statement that deceased struck the defendant first, hitting him two blows in the face, and followed up the attack until the defendant was pressed to the wall of the store. The defendant's mother stated that she not only did not say any thing to defendant about leaving his knife at home, but that she did not even know that he had a knife. In response to witness's reproaches for what had occurred, uttered immediately after the killing, the defendant said: "I couldn't help it; I had to do it; he struck me twice, and called you a liar and me a son of a bitch." One or two witnesses for the defense testified that the defendant was a quiet, peaceable boy, and that the deceased was a man, much older and heavier than defendant.

The charge of the court on the issue of self defense, referred to in the third head note of this report, reads as follows: "Homicide is justifiable under the law in the protection of one's person against any unlawful and violent attack, but the attack upon the person of an individual, in order to justify homicide, must be such as produces a reasonable expectation or fear of death, or serious bodily injury."

The motion for new trial raised the questions discussed in the opinion.

*Jones & Garnett,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

HURT, JUDGE. This is a conviction for manslaughter. If it was a voluntary homicide, then the conviction is correct; for the facts surrounding the killing show such an offense. But, suppose the intent to kill was wanting, under a state of facts which would make the homicide manslaughter—if the accused intended to kill—of what offense would the accused be guilty, if death ensued?

To constitute manslaughter, there must be a voluntary killing. Webster defines the word *voluntary* thus: "Done by design, or intention; purposed, intended; as, if a man kill another by lopping a tree, it is not voluntary manslaughter." If, then, the homicide can not be manslaughter unless there was an intention to kill, strip the case of murder and self defense, of what offense would the party killing be guilty? In other words, the circumstances are such as to constitute manslaughter, if there was the intent to kill—if the homicide was voluntary.

Now, if the homicide occurs by the use of means which are not in their nature calculated to produce death, the person killing is not to be deemed guilty of homicide, unless there was an intention to kill. But, suppose the means used were calculated to produce death, but there was no intention to kill—the sudden passion existing— would the homicide in such a case be manslaughter? Unquestionably, it would. (Penal Code, art. 614.) Here there seems to be a conflict; for we have seen that, to constitute manslaughter, there must be an intentional killing. To reconcile this conflict, we are of opinion that, though there is no intention to kill, yet, if the means used were in their nature calculated to produce death, and the killing is under sudden passion, then the party killing would be guilty of manslaughter.

This view is strengthened by a provision of article 615, which is that, if the circumstances attending the killing show an evil or a cruel disposition, the party killing may be guilty of manslaughter, though there was no intention to kill. We decide this proposition from all the provisions of the statute bearing upon this question: Where a homicide occurs under sudden passion, by the use of means not in their nature calculated to produce death, in the absence of an intention to kill, the circumstances not showing an evil or cruel disposition, the party killing would not be guilty of the homicide, but, self defense apart, would be guilty of some grade of assault and battery.

By reference to the facts it will be found that there is a question raised as to whether appellant intended to kill the deceased;

and it will also be found that an issue is presented as to whether the means used were in their nature calculated to produce death. In this state of case the trial judge should have submitted, by proper instructions, these issues to the jury. And if the jury had failed to find the intent to kill, or that the means used were in their nature calculated to produce death, then a verdict for some grade of assault and battery may or should have been the result.

We are by no means willing to sustain the charge of self defense; it is negative in character, when, under a well established rule, it should have been affirmative. We can not add any thing to that which has already been said by this court upon such charges.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered November 26, 1887.